**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| FELICIA MARTI and GUILLERMO MARTI, derivatively on behalf of ORTHOFIX MEDICAL INC., | Case No.: 2:24-cv-00864 |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| JON C. SERBOUSEK, KEITH VALENTINE, JOHN BOSTJANCIC, PATRICK KERAN, KIMBERLY A. ELTING, DOUGLAS C. RICE, WAYNE BURRIS, CATHERINE M. BURZIK, JASON M. HANNON, JOHN HENNEMAN, III, JAMES F. HINRICHS, SHWETA SINGH MANIAR, LILLY MARKS, MICHAEL E. PAOLUCCI, JOHN E. SICARD, and THOMAS A. WEST, | |
| Defendants, | |
| and | |
| ORTHOFIX MEDICAL INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Felicia Marti and Guillermo Marti (collectively, the "Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Orthofix Medical Inc. ("Orthofix" or the "Company"), file this Verified Shareholder Derivative Complaint against defendants Jon C. Serbousek ("Serbousek"), Keith Valentine ("Valentine"), John Bostjancic

- 1 -

("Bostjancic"), Patrick Keran ("Keran"), Kimberly A. Elting ("Elting"), Douglas C. Rice ("Rice"), Wayne Burris ("Burris"), Catherine M. Burzik ("Burzik"), Jason M. Hannon ("Hannon"), John Henneman, III ("Henneman"), James F. Hinrichs ("Hinrichs"), Shweta Singh Maniar ("Maniar"), Lilly Marks ("Marks"), Michael E. Paolucci ("Paolucci"), John E. Sicard ("Sicard"), and Thomas A. West ("West") (collectively, the "Individual Defendants," and together with Orthofix, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Orthofix, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of Section 14(a) Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act . As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon Plaintiffs' own knowledge and own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Orthofix, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Orthofix's directors and officers from October 11, 2022 through March 5, 2024, both dates inclusive (the "Relevant Period").

2.      Orthofix is an international orthopedics and spine company. Orthofix offers a wide array of biologics, spinal hardware, bone growth therapies, and specialized orthopedic solutions to healthcare providers in over 60 countries worldwide.

3.      At the start of the Relevant Period, on October 11, 2022, the Company entered into a definitive merger agreement with SeaSpine, a global medical technology company that provided surgical solutions for the treatment of spinal disorders (the "Merger"). During the Merger announcement, the Company also announced that SeaSpine's current President and Chief Executive Officer ("CEO"), Defendant Valentine, would take over as President and CEO of the new combined company, as well as serve as a director on the combined company's Board of Directors ("Board").

4.      On November 8, 2022, the Company filed a draft registration statement with the SEC on Form S-4 (collectively, with its subsequent amendments, the "Registration Statement"), registering Orthofix shares to be issued and exchanged to SeaSpine shareholders following the completion of the Merger. Defendants Serbousek and Valentine signed or authorized the signing of the Registration Statement.

5.      On November 21, 2022, it was announced that SeaSpine's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), Defendant Bostjancic, and Seaspine's Senior Vice President ("SVP") and General Counsel, Defendant Keran, would take over as the CFO and Chief Legal Officer ("CLO") of the newly combined company upon completion of the Merger, respectively.

6.      On November 22, 2022, the Registration Statement was declared effective by the SEC.

- 3 -

7. On November 23, 2022, the Company filed a prospectus (collectively, with its subsequent amendments, the "Prospectus") on Form 424B3 in connection with the Merger, which forms part of the Registration Statement. The Prospectus solicited shareholder approval of the Merger through calling Company shareholders to attend a special meeting of Company shareholders to be held on January 4, 2023 to vote to approve the Merger through a proposal that would issue Orthofix common stock to SeaSpine stockholders as contemplated by the Agreement and Plan of Merger, dated as of October 10, 2022 (the "Merger Agreement").

8. On January 4, 2023, after the shareholders approved the Merger pursuant to the materially false and misleading Prospectus, the Company and SeaSpine announced the completion of the Merger, effective the following day, January 5, 2023. Pursuant to the terms of the Merger, former SeaSpine stockholders would receive over 16 million shares of Orthofix common stock directly in exchange for their SeaSpine shares, equating to approximately 0.4163 shares of Orthofix common stock per share of SeaSpine common stock. SeaSpine shareholders would also receive cash in lieu of any fractional shares as the result of this exchange rate.

9. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to implement adequate internal controls that would prevent certain Individual Defendants who engaged in repeated inappropriate and offensive conduct from obtaining several of the highest officer positions of the combined Company and by causing the Company to issue materially false and misleading financial information in its public disclosures and SEC filings. In particular, the Individual Defendants failed to disclose adverse information regarding the Company's executive officers and the adequacy of the Company's internal controls. These inadequate internal controls resulted in the Company's failure to comply with SEC rules and

regulations and eventually forced the Company to restate several financial statements filed with the SEC and terminate Defendants Valentine, Bostjancic and Keran. Orthofix shareholders, including Plaintiffs, would not have approved the Merger had they known the truth about the Company's inadequate internal controls and the misconduct of Defendants Valentine, Bostjancic and Keran.

10.     Despite becoming aware of the Company's inadequate internal controls when the Merger was contemplated, the Individual Defendants concealed this reality from investors, Company shareholders, and the overall public for months and failed to take timely mitigative action, instead making a series of false and misleading statements touting the health of the Company and suggesting that the only routine internal controls challenges the Company was facing stemmed from the reporting requirements of a public company. Indeed, the Individual Defendants did not begin to disclose the severity of the internal controls issue to Company shareholders or to the public until September 12, 2023, when the Company revealed in a press release that it was appointing an interim CEO, interim CFO, and interim CLO, effective immediately, following the "unanimous decision by the Board's independent directors to terminate for cause Keith Valentine, John Bostjancic and Patrick Keran from those respective roles," despite having served in those prestigious officer positions for mere months.

11.     On this news, the Company's stock fell $5.62 per share, or 30.2%, from closing at $18.63 per share on September 11, 2023 to close at $13.01 per share on September 12, 2023 on unusually heavy trading volume.

12.     Yet, the true reality surrounding the Company's internal control issues was not uncovered until March 5, 2024, when the Company issued its annual report for the fiscal year

ended December 31, 2023 (the "2023 Fiscal Year") on Form 10-K (the "2023 10-K"). The 2023 10-K revealed that the Company's internal controls were not effective as of December 31, 2023, as they suffered from a "material weakness in the design and operation of certain management review controls pertaining to business combinations….resulting from insufficient evidence supporting the precision over the determination of certain estimates and insufficient evidence supporting the operating effectiveness of the associated review controls. . ."

13.     On this news, the Company's stock fell $0.07 per share, or 0.5%, from closing at $13.07 per share on March 4, 2024 to close at $13.00 per share on March 5, 2024.

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the highest officers of the Company's executive management were not committed to conducting business in accordance with legal and ethical standards; (2) these same officers, Defendants Valentine, Bostjancic, and Keran, did not believe in nor the Company maintaining a strong performance-based culture that focuses on integrity, collaboration, innovation, diversity, and corporate responsibility; (3) as such, Defendants Valentine, Bostjancic, and Keran were instead engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements"; (4) the Company was aware of these violations and downplayed the impact they had on the Company's internal controls; and (5) Orthofix failed to

maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

15.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining personal proceeds of $75,650.

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

17.     In light of the Individual Defendants' misconduct—which has subjected Orthofix, two of its former President and CEOs, its former CFO, and its former CLO, and two former members of its Board to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Texas (the "Texas Securities Class Action") and a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of California against two of its former President and CEOs, its former CFO, two of its former CLOs, seven former members of its Board, and three current directors of its Board (the "California Securities Class Action," and together with the Texas Securities Class Action, the "Securities Class Actions") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, some of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the current Board members' liability in the California Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Orthofix's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1) and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act and the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because the alleged misstatements and wrongs

- 8 -

complained of herein entered this District, the Defendants have conducted business in this District, the Company is headquartered in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

24.     Plaintiffs are current shareholders of Orthofix. Plaintiffs have continuously held Orthofix common stock since first purchasing the stock in 2014.

### Nominal Defendant Orthofix

25.     Nominal Defendant Orthofix is a Delaware corporation with its principal executive offices at 3451 Plano Parkway, Lewisville, Texas 75056. Orthofix's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "OFIX."

### Defendant Serbousek

26.     Defendant Serbousek served as Orthofix's President, CEO, and as a Company director from November 2019 until the Merger in January 2023. From January 2023 until July 2023, Defendant Serbousek served as the Company's Executive Chairman. According to the Schedule 14A the Company filed with the SEC on April 29, 2024 (the "2024 Proxy Statement"), as of April 22, 2024, Defendant Serbousek owned 514,778 shares of the Company's common stock, which constituted 1.4% of all shares. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Serbousek owned approximately $6.7 million worth of Orthofix common stock as of that date.

27.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Serbousek received $6,316,051 in total compensation from the Company. This consisted of

$800,000 in salary, $4,999,987 in stock awards, $446,040 in non-equity incentive plan compensation, and $70,024 in all other compensation. For the 2023 Fiscal Year, Defendant Serbousek received $15,628,123 in total compensation from the Company. This included $424,616 in salary, $428,055 in bonuses, $10,605,610 in stock awards, $836,940 in option awards, and $3,332,902 in all other compensation.

28.     The Schedule 14A the Company filed with the SEC on April 27, 2023 (the "2023 Proxy Statement"), stated the following about Defendant Serbousek:

> **Jon C. Serbousek.** Prior to being named Executive Chairman in January 2023, Mr. Serbousek served as our President and Chief Executive Office (and a member of the Board) since November 2019, after previously having joined the Company in August 2019 as our President of Global Spine. A seasoned executive with more than 30 years' experience in the medical device and biotech industries, Mr. Serbousek previously served in several leadership positions at Biomet Inc., including Worldwide President of Biomet Biologics, Worldwide Group President of Orthopedics, and President of U.S. Orthopedics. Prior to joining Biomet, he held various general management positions within Medtronic Inc., including Worldwide Division President − Spine, and Worldwide Vice President and General Manager of Biologics for their Spine and Biologics business. Additionally, Mr. Serbousek spent 13 years with DePuy Orthopedics, a Johnson & Johnson company where he served in numerous roles of increasing responsibility, including Vice President of Marketing and Product Development and Vice President of Spinal Operations. Mr. Serbousek has held numerous board positions at for profit and not-for-profit organizations. He earned his B.S. in Engineering from Washington State University, his M.S. in Bioengineering from the University of Utah, and later completed several advanced management programs including a program at the IMD International School of Management in Lausanne, Switzerland.

**<u>Defendant Valentine</u>**

29.     Defendant Valentine served as the Company's President, CEO, and as a director from the Merger in January 2023 until he was removed by the Board in September 2023. Previously, he served as the President and CEO of SeaSpine from May 2015 until the Merger in January 2023. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Valentine

owned 160,607 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Valentine owned approximately $2.1 million worth of Orthofix common stock as of that date.

30.    For the 2023 Fiscal Year, Defendant Valentine received $6,484,267 in total compensation from the Company. This included $598,731 in salary, $2,936,764 in stock awards, $2,936,510 in option awards, and $12,263 in all other compensation.

31.    The 2023 Proxy Statement stated the following about Defendant Valentine:

**Keith C. Valentine.** Mr. Valentine was appointed President and Chief Executive Officer in January 2023 following the merger with SeaSpine. He served as the CEO and President of SeaSpine from 2015 to the effective date of the merger. Prior to joining SeaSpine, Mr. Valentine served as President and Chief Operating Officer of NuVasive Inc. from 2007 to 2012 and as President from 2004 to 2007. While at NuVasive, Keith served in various senior executive roles of increasing responsibility in marketing, development, and operations. Previously, he served as Vice President of Marketing at ORATEC Interventions Inc., a medical device company acquired by Smith & Nephew PLC, and spent eight years in various roles with Medtronic Sofamor Danek including Vice President of Marketing for the Rods Division and Group Director for the BMP Biologics program, the Interbody Sales Development Effort, and International Sales and Marketing. Keith received a B.B.A. in Management and Biomedical Sciences from Western Michigan University.

**<u>Defendant Bostjancic</u>**

32.    Defendant Bostjancic served as the Company's CFO from the Merger in January 2023 until he was removed by the Board in September 2023. Previously, he had served as SeaSpine's COO and CFO from December 2014 until the Merger in January 2023. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Bostjancic owned 47,286 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Bostjancic owned approximately $618,501 worth of Orthofix common stock as of that date.

33.     For the 2023 Fiscal Year, Defendant Bostjancic received $1,847,889 in total compensation from the Company. This included $367,231 in salary, $734,175 in stock awards, $734,128 in option awards, and $12,355 in all other compensation.

34.     The 2023 Proxy Statement stated the following about Defendant Bostjancic:

**John Bostjancic**. Mr. Bostjancic was appointed as Chief Financial Officer in January 2023 following the Merger. Prior to the Merger, he served as Chief Financial Officer of SeaSpine since March 2015, and in May 2022 he was appointed to his expanded role of Chief Operating and Financial Officer. Prior to this, he served as Treasurer and Senior Vice President at SeaSpine. Mr. Bostjancic served as acting Chief Financial Officer of the SeaSpine business within Integra Life Sciences Holdings Corporation from 2014 to 2015 and from 2012 to 2014 he was Senior Vice President of Global Supply Chain at Integra. Mr. Bostjancic's responsibilities included global planning, kitting, distribution, logistics and customer service in the role, and he led the project team implementing the U.S. Food and Drug Administration's "unique device identifier" rule in 2014. From 2008 to 2012, he was Senior Vice President of Financial Planning and Analysis at Integra. Since joining Integra in 1999, he held roles of increasing responsibility in the finance organization, including Corporate Controller from 2003 through 2006. Before joining Integra, from 1998 through 1999 Mr. Bostjancic was a manager in the accounting standards team at Merck & Co., Inc., a publicly traded health care company. From 1993 to 1998, he worked in the business assurance organization at PricewaterhouseCoopers. Mr. Bostjancic received his B.S. in Accounting from the College of New Jersey.

**Defendant Keran**

35.     Defendant Keran served as the Company's CLO from the Merger in January 2023 until he was removed by the Board in September 2023. Previously, he served as the SVP and General Counsel of SeaSpine from October 2015 until the Merger in January 2023. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Keran owned 33,122 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Keran owned approximately $433,236 worth of Orthofix common stock as of that date.

36.     For the 2023 Fiscal Year, Defendant Keran received $1,832,958 in total compensation from the Company. This included $352,462 in salary, $734,175 in stock awards, $734,128 in option awards, and $12,193 in all other compensation.

37.     The 2023 Proxy Statement stated the following about Defendant Keran:

**Patrick L. Keran.** Mr. Keran was appointed Chief Legal Officer in January 2023 following the Merger. He served as the General Counsel of SeaSpine since October 2015, Secretary since June 2016 and, in June 2020 was designated a Senior Vice President. Prior to joining SeaSpine, Mr. Keran provided strategic and business advisory services to a variety of life sciences companies, including acting as Chief Legal Officer to NAIA Pharmaceuticals, Inc., a privately held international drug development company. From February 2010 to February 2015, he served as President and Chief Operating Officer of Mast Therapeutics, Inc., a publicly held clinical stage biopharmaceutical company, and from August 2006 to February 2010, he served as its General Counsel. Mr. Keran also served as Mast's secretary from September 2006 to February 2015 and served as its Principal Financial Officer from July 2009 to January 2013. Previously, from 2004 to 2006, Mr. Keran was Associate General Counsel at Ionis Pharmaceuticals, Inc. (formerly known as Isis Pharmaceuticals, Inc.), a publicly held drug discovery and development company. From 1999 to 2004, he practiced corporate law at the law firms of Heller Ehrman LLP and Brobeck Phleger & Harrison LLP, specializing in public and private financings, licensing arrangements, mergers and acquisitions and corporate governance matters. Mr. Keran is licensed to practice law in the State of California. He received a B.A. from the University of California at San Diego and a J.D. from the University of California at Berkeley, School of Law.

**Defendant Elting**

38.     Defendant Elting formerly served as the Company's President, Global Orthopedics from April 2022 until July 2024. Previously, she had served as the Company's CLO from September 2016 until November 2017. From November 2017 until July 2020, Defendant Elting served as the Company's joint CLO-Chief Administrative Officer, and from July 2020 until December 2022, as the Company's joint CLO-Chief Development Officer. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Elting owned 199,144 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of

trading on April 22, 2024 was $13.08, Defendant Elting owned approximately $2.6 million worth of Orthofix common stock as of that date.

39.     For the 2022 Fiscal Year, Defendant Elting received $2,966,672 in total compensation from the Company. This included $475,549 in salary, $2,200,005 in stock awards, $270,738 in non-equity incentive plan compensation, and $20,380 in all other compensation. For the 2023 Fiscal Year, Defendant Elting received $3,552,657 in total compensation from the Company. This included $494,626 in salary, $250,000 in bonus, $1,666,812 in stock awards, $734,128 in option awards, $374,616 in non-equity incentive plan compensation, and $20,380 in all other compensation.

40.     The 2024 Proxy Statement stated the following about Defendant Elting:

**Kimberley A. Elting.** Ms. Elting has served as our President, Global Orthopedics since April 2022 and, served as our Interim Chief Legal Officer from November 2023 until April 2024. She originally joined the Company as Chief Legal Officer in September 2016 and was named Chief Legal and Administrative Officer in 2017, and served as Chief Legal and Development Officer from 2020 until January 2023. Before joining Orthofix, she had served since 2013 as General Counsel and Vice President Corporate Affairs at TriVascular Technologies, Inc.. In this role, she led the legal, compliance, human resources (HR) and government affairs functions for the company. Between 2007 and 2012, she served in various roles of increasing responsibility with St. Jude Medical, including General Counsel and Vice President of HR and Health Policy for the Neuromodulation Division. She was previously a partner at the Jones Day law firm where she counseled clients in the health care sector on mergers and acquisitions and regulatory matters. A graduate of Ithaca College, Ms. Elting earned her Law Degree from the University of Denver and an LL.M. in Health Law from Loyola University Chicago.

**Defendant Rice**

41.     Defendant Rice served as the Company's CFO from September 2014 until the Merger in January 2023. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Rice owned 184,837 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Rice owned approximately $2.4 million worth of Orthofix common stock as of that date.

42.     For the 2022 Fiscal Year, Defendant Rice received $2,491,385 in total compensation from the Company. This included $475,549 in salary, $1,824,988 in stock awards, $176,862 in non-equity incentive plan compensation, and $14,086 in all other compensation. For the 2023 Fiscal Year, Defendant Rice received $3,965,945 in total compensation from the Company. This included $9,145 in salary, $3,311,885 in stock awards, $236,670 in option awards, and $408,245 in all other compensation.

43.     The 2023 Proxy Statement stated the following about Defendant Rice:

**Douglas C. Rice.** Mr. Rice was the Company's Chief Financial Officer from 2015 through the closing of the merger in January 2023, and currently serves an executive consultant through June 2023. He joined Orthofix as the Chief Accounting Officer in 2014. Prior to joining the Company, Mr. Rice was the CFO of Vision Source, an international optometric network provider, where he had served since 2012. Mr. Rice served as the VP Finance, Treasurer of McAfee, a security technology company, from 2007 to 2012, when it was acquired by Intel. From 2000 to 2007, he served as the SVP, Corporate Controller of Concentra, Inc., a national healthcare service provider. Mr. Rice's over 30 years of finance experience also includes finance leadership positions with la Madeleine, Allied Marketing Group and PricewaterhouseCoopers (formerly Coopers & Lybrand). He is a CPA and holds an MBA and a BBA, with honors, from Southern Methodist University.

## Defendant Burris

44.     Defendant Burris has served as a Company director since June 2023, as well as previously from September 2021 through January 2023. He also serves as Chair of the Audit & Finance Committee as well as a member of the Nominating, Governance & Sustainability Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Burris owned 10,163 shares of the Company's common stock. Given that the price per share of the Company's

common stock at the close of trading on April 22, 2024 was $13.08, Defendant Burris owned approximately $132,932 worth of Orthofix common stock as of that date.

45.     For the 2022 Fiscal Year, Defendant Burris earned $245,022 in total compensation from the Company. This included $70,00 in fees earned or paid in cash and $175,022 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant Burris received $539,703 in total compensation from the Company. This included $39,695 in fees earned or paid in cash, $200,008 in grant date fair value of restricted stock awards, and $300,000 in grant date fair value of option awards.

46.     The 2024 Proxy Statement stated the following about Defendant Burris:

Mr. Burris was re-elected to the Orthofix Board of Directors and appointed to the Audit and Finance and Compliance and Ethics Committees in June 2023. He previously served as a member of our Board and on our Audit and Finance Committee from September 2021 until the consummation of the Company's merger with SeaSpine in January 2023. He also served on our Compensation and Talent Development Committee from June 2022 until January 2023. Mr. Burris was the Senior Vice President and Chief Financial Officer at Roche Diagnostics Corporation ("Roche") from 1996 through his retirement in July 2019. He was a member of the Global Roche Diagnostics Finance Executive Committee where he was recognized as one of their top senior leaders. Mr. Burris serves on the Board of Directors of Accelerate Diagnostics, where he chairs the Audit Committee. In addition to his service as Senior Vice President and CFO at Roche, Mr. Burris held various roles of increasing responsibility, including as the head of global finance for the diabetes care business, where he provided financial oversight for all aspects of the business including sales and marketing, research and development, operations, regulatory and quality. In his roles at Roche, he provided strategic and business development guidance broadly across the Roche organization. Before joining Roche, Mr. Burris was a senior manager for Price Waterhouse LLP. Mr. Burris is a Certified Public Accountant and has a Bachelor of Science in Accounting and Finance from Butler University. He has been instrumental in expanding and cultivating the State of Indiana Lifesciences environment while serving within numerous community organizations, including being a founding board member of the Indiana Biosciences Research Institute and on the Board of Directors and Executive Committee for BioCrossroads.

The Board believes that Mr. Burris' extensive experience in finance and accounting

as well as his industry experience brings valuable experience to the Board.

**Defendant Burzik**

47.     Defendant Burzik has served as a Company director from 2021 until June 2024. She also served as the Lead Independent Director of the Board and as a member of the Compliance & Ethics Committee. According to the 2024 Proxy Statement as of April 22, 2024, Defendant Burzik owned 128,823 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Burzik owned approximately $1.7 million worth of Orthofix common stock as of that date.

48.     For the 2022 Fiscal Year, Defendant Burzik earned $380,002 in total compensation from the Company. This included $137,500 in fees earned or paid in cash and $242,502 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant Burzik received $510,168 in total compensation from the Company. This included $139,538 in fees earned or paid in cash and $370,630 in grant date fair value of restricted stock awards.

49.     The 2024 Proxy Statement stated the following about Defendant Burzik:

Catherine Burzik serves as Chair of the Board. She was re-appointed as Chair of the Board in June 2023. Previously Ms. Burzik served as the Company's Chair of the Board from 2021-2022 before assuming the position of Lead Independent Director of the combined board that was formed from the merger of SeaSpine and Orthofix. Prior to this, she was President and Chief Executive Officer of Kinetic Concepts, Inc., a global medical device company, from 2006 until the company's sale in 2011. Prior to that, Ms. Burzik served as President of Applied Biosystems Group and held senior executive positions at Eastman Kodak and Johnson & Johnson, including Chief Executive Officer and President of Kodak Health Imaging Systems and President of Ortho-Clinical Diagnostics, Inc., a Johnson & Johnson company. In 2019, Ms. Burzik received the AdvaMed Lifetime Achievement Award that honors accomplishments of pioneers in the medical technology industry whose contributions have had a significant impact on patients' lives and the industry as an essential part of America's economy. Currently Ms. Burzik is a member of the Board of Directors of Becton, Dickinson and Company, where she Chairs the Quality and Regulatory Compliance Committee and serves on the

Corporate Governance and Nominating Committee. Ms. Burzik is also a member of the Board of Directors of Haemonetics Corporation where she Chairs the Technology Committee and serves on the Audit Committee. Additionally, she serves as Chairman Emeritus of StemBioSys, Inc. and Chairman Emeritus of the American College of Wound Healing and Tissue Repair. Ms. Burzik previously served on the Board of Directors for the San Antonio Branch of the Dallas Federal Reserve Board, Allscripts, Inc., Bausch & Lomb, Cordis Corporation and AdvaMed.

The Board believes that Ms. Burzik brings strong strategic, product development and leadership expertise to the Board, together with extensive knowledge of the global healthcare field, based on her long career as a seasoned executive leading major medical device, diagnostic, diagnostic imaging and life sciences businesses.

**Defendant Hannon**

50.     Defendant Hannon has served as a Company director since June 2020. He also serves as the Chair of the Compliance & Ethics Committee as well as a member of the Compensation & Talent Development Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Hannon owned 57,913 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Hannon owned approximately $6757,502 worth of Orthofix common stock as of that date.

51.     For the 2022 Fiscal Year, Defendant Hannon earned $255,022 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $175,022 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant Hannon received $376,249 in total compensation from the Company. This included $76,250 in fees earned or paid in cash and $299,999 in grant date fair value of restricted stock awards.

52.     The 2024 Proxy Statement stated the following about Defendant Hannon:

Mr. Hannon has served on the Board since June 2020. A seasoned medical device executive, since September 2017 he has served as President and Chief Executive

Officer of Mainstay Medical International plc, a global company headquartered in Ireland that has developed and commercialized the first restorative neurostimulation treatment for chronic back pain. Mr. Hannon previously served as President and Chief Operating Officer of NuVasive, Inc. Over the course of 12 years at NuVasive, Inc., he held various roles, including Executive Vice President, International; Executive Vice President, Corporate Development; and General Counsel. Mr. Hannon has a J.D. degree from Stanford University Law School and a B.A. degree from the University of California, Berkeley.

The Board believes that Mr. Hannon's experience leading medical device companies brings valuable industry experience to the Board.

**Defendant Henneman**

53.     Defendant Henneman has served as a Company director since the Merger in January 2023. Previously, he served as a member of SeaSpine's Board from July 2015 until the Merger in January 2023. He also serves as the Chair of the Nominating, Governance & Sustainability Committee and as a member of the Audit & Finance Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Henneman owned 80,540 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Henneman owned approximately $1.1 million worth of Orthofix common stock as of that date.

54.     For the 2023 Fiscal Year, Defendant Henneman received $355,416 in total compensation from the Company. This included $55,417 in fees earned or paid in cash and $299,999 in grant date fair value of restricted stock awards.

55.     The 2024 Proxy Statement stated the following about Defendant Henneman:

Mr. Henneman served on the Board of Directors of SeaSpine since July 2015. Mr. Henneman has more than 25 years of combined financial and operational management experience in the life sciences industry. Mr. Henneman served as Executive Vice President and Chief Financial Officer of NewLink Genetics Corporation from October 2014 to July 2018, and as its Chief Administrative Officer from July 2018 to November 2018. Prior to joining NewLink Genetics, Mr.

Henneman served at Integra LifeSciences Holdings in various capacities between 1998 and 2014. Before becoming Integra's Chief Financial Officer in 2007, Mr. Henneman served Integra as General Counsel and Chief Administrative Officer, responsible at various times for Integra's business development, regulatory affairs, quality systems, clinical affairs, human resources, information systems, and legal affairs functions and the management of Integra's surgical instruments business. Mr. Henneman also serves on the Board of Directors of R1 RCM, Inc., a public company providing revenue cycle management services to hospitals and physicians; Aprea Therapeutics, Inc., a public biotechnology company; Anika Therapeutics, Inc., a public medical device company focused on joint preservation and health; and Alafair Biosciences, Inc., a privately held medical device company. Mr. Henneman received an A.B. in Politics from Princeton University and a J.D. from the University of Michigan Law School.

The Board believes that Mr. Henneman's senior management experience, his service on other boards of directors, and his extensive experience in the areas of finance, financial accounting, legal affairs, business transactions, and mergers and acquisitions brings value to the Board.

**Defendant Hinrichs**

56.     Defendant Hinrichs has served as a Company director from April 2014 until June 2024. He also served as the Chair of the Compliance & Ethics Committee and as a member of Compensation & Talent Development Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Hinrichs owned 117,260 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Hinrichs owned approximately $1.5 million worth of Orthofix common stock as of that date.

57.     For the 2022 Fiscal Year, Defendant Hinrichs earned $260,022 in total compensation from the Company. This included $85,000 in fees earned or paid in cash and $175,022 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant Hinrichs received $388,749 in total compensation from the Company. This included $88,750 in fees earned or paid in cash and $299,999 in grant date fair value of restricted stock awards.

58.     The 2024 Proxy Statement stated the following about Defendant Hinrichs:

Mr. Hinrichs was appointed to the Board in April 2014. Mr. Hinrichs is currently Co-Founder of Atmas Health. From 2018 to 2019, he served as Chief Financial Officer of Cibus, a privately held agricultural biotech company. Prior to this, Mr. Hinrichs served as Executive Vice President and Chief Financial Officer of Alere Inc, a publicly traded diagnostic company, preceding its sale to Abbott Labs. From December 2010 through March 2015, he served as Chief Financial Officer of CareFusion Corporation, prior to its sale to Becton Dickinson. Mr. Hinrichs previously served as CareFusion's Senior Vice President, Global Customer Support, and as its Senior Vice President, Controller. Prior to joining CareFusion when it was spun off from Cardinal Health, Inc., he worked at Cardinal Health in various positions including Executive Vice President and Corporate Controller of Cardinal Health, and as Executive Vice President and Chief Financial Officer of its Healthcare Supply Chain Services segment. Mr. Hinrichs joined Cardinal Health following more than a decade of finance and marketing roles at Merck & Co. He holds undergraduate and graduate degrees in business from Carnegie Mellon University. Mr. Hinrichs serves as a director of Integer Holdings Corporation and Outset Medical. He also serves as a director of several privately held companies.

The Board believes that Mr. Hinrichs' financial and accounting experience gained through his professional career, including his experience as a public company chief financial officer, provide value to the Board.

**Defendant Maniar**

59.     Defendant Maniar has served as a Company director since the Merger in January 2023. She also serves as a member of the Audit & Finance Committee and the Compliance & Ethics Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Maniar owned 20,080 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Maniar owned approximately $262,646 worth of Orthofix common stock as of that date.

60.     For the 2023 Fiscal Year, Defendant Maniar received $355,416 in total compensation from the Company. This included $55,417 in fees earned or paid in cash and $299,999 in grant date fair value of restricted stock awards.

61.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Maniar made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 10, 2023 | 4,262 | $17.75 | $75,650 |

Thus, in total, before the fraud was exposed, she sold 4,262 shares of Company stock on inside information, for which she received approximately $75,650 in proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the schemes.

62.    The 2024 Proxy Statement stated the following about Defendant Maniar:

Ms. Maniar served on the Board of Directors of SeaSpine since April 2021. Since July 2018, Ms. Maniar has served as Google's Global Leader, Healthcare and Life Sciences Solutions and Strategy, Google Cloud, focused on BioPharma and Biotechnology. Google is a multinational technology company that specializes in Internet-related services and products, where she leads vision, strategy, and execution of Google Cloud's industry strategy and go-to-market model. Prior to joining Google, from November 2013 to June 2018, Ms. Maniar worked in various capacities at Genentech, where she led market growth strategies relevant to technology accelerators for therapies and diagnostics. Before Genentech, from February 2012 to July 2013, Ms. Maniar served as Director for the Center of Minimally Invasive Therapeutics at Summa Health. Ms. Maniar currently serves on the Board of Directors of RxSight and on the Scientific Advisory Board of The Allen Institute. Earlier in her career, Ms. Maniar spent several years working in a research capacity at the Cleveland Clinic and the Austen BioInnovation Institute in Akron where she was primarily focused on medical devices and minimally invasive therapeutics. Ms. Maniar received a B.A. in Economics from the University of California, San Diego.

The Board believes that Ms. Maniar's thought leadership in areas of strategic focus for the company, such as enabling technologies and data analytics, adds value to the Board.

**Defendant Marks**

63.     Defendant Marks served as a Company director from June 2015 until the Merger in January 2023.

64.     For the 2022 Fiscal Year, Defendant Marks earned $255,022 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $175,022 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant Marks received $21,111 in total compensation from the Company, consisting entirely of fees earned or paid in cash.

65.     The Schedule 14A the Company filed with the SEC on April 27, 2022 (the "2022 Proxy Statement"), stated the following about Defendant Marks:

> Ms. Marks, 74, was appointed to the Board in June 2015. From 2010 to 2021, Ms. Marks served as Vice President for Health Affairs for the University of Colorado and Anschutz Medical Campus, which includes the university's Schools of Medicine, Dental Medicine, Pharmacy, Public Health, College of Nursing and Graduate School and the University of Colorado Hospital and Children's Hospital Colorado. Prior to her health campus leadership role, Ms. Marks spent two decades as both Senior Associate Dean for Finance and Administration at the University of Colorado's School Of Medicine and Executive Director of University Physicians, Inc., the 501(c)(3) faculty practice plan, which offers business operations and administrative support to the University of Colorado's School of Medicine providers. Ms. Marks has served as chair of the board of directors of the University of Colorado Hospital and as a member of the board of directors of the Federal Reserve Bank of Kansas City, the Fitzsimons Redevelopment Authority, the National Institutes of Health Advisory Board on Clinical Research, the Global Down Syndrome Foundation, and the Rose Community Foundation. She also was formerly the chair of the board of the Association of American Medical Colleges (AAMC) and a member of the AAMC Advisory Panel on Research and a trustee of the University of Colorado Foundation. Ms. Marks is a graduate of the University of Colorado. In addition to these roles, Ms. Marks is also active as a national speaker on healthcare economics, healthcare system issues, and academic medicine.
>
> The Board believes that Ms. Marks' extensive experience from her previous and current board memberships, as well as her accomplished academic background, brings unique and valuable insight to the Board.

- 23 -

**Defendant Paolucci**

66.     Defendant Paolucci has served as a Company director since March 2016. He also serves as a member of the Nominating, Governance & Sustainability Committee and as a member of the Compensation & Talent Committee. According to the 2024 Proxy Statement, as of April 22, 2024, Defendant Paolucci owned 80,614 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 22, 2024 was $13.08, Defendant Paolucci owned approximately $1.1 million worth of Orthofix common stock as of that date.

67.     For the 2022 Fiscal Year, Defendant Paolucci earned $255,022 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $175,022 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant Paolucci received $376,249 in total compensation from the Company. This included $76,250 in fees earned or paid in cash, $299,999 in grant date fair value of restricted stock awards.

68.     The 2024 Proxy Statement stated the following about Defendant Paolucci:

Mr. Paolucci was named to the Orthofix Board of Directors and appointed to the Compensation Committee in March 2016. A seasoned Human Resource (HR) executive, he has more than 20 years of global experience working directly with Boards of Directors and C-level executives to improve organizational capabilities and HR programs that result in sustained improvements in business performance. Mr. Paolucci served as the Executive Vice President, Chief People Officer for Mirati Therapeutics, a commercial stage oncology biotech company focused on finding and delivering meaningful targeted oncology solutions for genetic and immunological drivers of cancer, from 2022 until January 2024 when it was acquired by Bristol Meyers Squibb. From 2021 until March of 2022, Mr. Paolucci served as Executive Vice President, Chief Human Resources Officer for Arena Pharmaceuticals until its acquisition by Pfizer. Prior to that, Mr. Paolucci served as Vice President and Chief Human Resources Officer for Halozyme Therapeutics Inc., a late-stage oncology and biopharmaceutical company. Prior to Halozyme, Mr. Paolucci served as Executive Vice President and Chief Human Resource Officer for CareFusion. Additionally, Mr. Paolucci served as Executive Vice

- 24 -

President of Human Resources at NuVasive and spent five years at Life Technologies. Previously, he was head of Human Resources for the services division of Hewlett Packard and served in several leadership roles with EDS, which was acquired by Hewlett Packard. Prior to HP/EDS, Mr. Paolucci was a partner with the HR consulting firm Towers Perrin. Mr. Paolucci is a graduate of The Ohio State University.

The Board believes that Mr. Paolucci's extensive experience as a human resources executive and relevant knowledge and understanding of public company compensation issues brings unique and valuable insight to the Board.

**Defendant Sicard**

69.     Defendant Sicard served as a Company director from March 2018 until the Merger in January 2023. He also has served as a member of the Audit & Finance Committee and as a member of the Compliance & Ethics Committee.

70.     For the 2022 Fiscal Year, Defendant Sicard earned $245,022 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $175,022 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant Sicard received $18,472 in total compensation from the Company, which consisted entirely of fees earned or paid in cash.

71.     The 2022 Proxy Statement stated the following about Defendant Sicard:

Mr. Sicard, 59, became a director of Orthofix in March 2018. Since January 2016, he has served as the President and Chief Executive Officer, and Board Member of Kinaxis Inc., a global supply chain management software company that delivers cloud-based solutions to some of the world's largest manufacturing companies, including many in the life science sector. Mr. Sicard joined Kinaxis in 1994 where he held a number of senior management roles including Chief Product Officer from October 2013 to January 2016 and Chief Strategy Officer from September 2012 to September 2013, as well as previously serving as Chief Operating Officer, Executive Vice President of Marketing Development and Service Operations and Vice President of Professional Services. Prior to Kinaxis, Mr. Sicard held positions at FastMAN Software Systems, and Monenco Agra. Mr. Sicard is a graduate of Concordia University, Montreal, Canada, and the Harvard Business School Advanced Management Program.

The Board believes that Mr. Sicard's extensive experience as a strategic supply chain management executive, as well as his current board membership, brings unique and valuable insight to the Board.

**Defendant West**

72.     Defendant West served as a Company director from November 2021 until the Merger in January 2023.

73.     For the 2022 Fiscal Year, Defendant West earned $245,022 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $175,022 in grant date fair value of restricted stock awards. For the 2023 Fiscal Year, Defendant West received $18,472 in total compensation from the Company, which consisted entirely of fees earned or paid in cash.

74.     The 2022 Proxy Statement stated the following about Defendant West:

Mr. West, 58, was appointed to the Board and to the Compensation and Talent Development Committee in December 2021. He currently serves as the President and Chief Executive Officer of Intersect ENT, Inc. a commercial stage drug-device company that pioneers local drug delivery options for ear, nose and throat surgeons. As president and CEO of Intersect ENT, he led the transformation of the business from a single technology player to a more comprehensive ENT company, resulting in a definitive agreement in August 2021 to be acquired by Medtronic. Prior to Intersect ENT, Mr. West served as Division President, Diagnostic Solutions at Hologic, Inc. Additionally, he spent 23-years at Johnson & Johnson in various roles of increasing responsibility, including serving as Worldwide Vice President, strategic Alliances and Business Development, Diabetes Solutions Companies. Mr. West has an A.B. in Politics and Economics from Princeton University and a M.B.A. from the Wharton School of the University of Pennsylvania in Marketing. He is a member of the Board of Directors of the Advanced Medical Technology Association (AdvaMed).

The Board believes that Mr. West's extensive management experience in the healthcare industry, as well as his current board membership, brings unique and valuable insight to the Board.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

- 26 -

75.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

76.     Each director and/or officer of the Company owes to Orthofix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

77.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

78.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

79.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants at Orthofix had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination

of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

80.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Orthofix's own Corporate Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made

of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

81.    Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

82.    At all times relevant hereto, the Individual Defendants at Orthofix were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

83.    Because of their advisory, executive, managerial, and directorial positions with the

Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

84.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

87.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of Orthofix's board of directors, each of the Individual Defendants who was a director of Orthofix was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## ORTHOFIX'S CORPORATE GOVERNANCE

### Code of Conduct

90.     The Company's Code of Conduct "applies to Orthofix" and "every person working for or on behalf of the Company, including as a director, officer, or employee." The Code of Conduct states the "Purpose" of the Code of Conduct is to "express[] the standards of integrity and business conduct expected of every employee, director, and officer of Orthofix as well as all contracted Orthofix associates."

91.     Under the same heading, the Code of Conduct states that the "goal" of the Code of Conduct is:

[T]o prevent and detect wrongdoing and to promote:

- Accountability;

- Honest and ethical conduct;

- A respectful workplace for all employees;

- Full, fair, accurate, timely, and understandable government disclosures and public statements;

- Compliance with all applicable governmental laws, rules and regulations; and

- The prompt internal reporting of violations of the Code.

92.     In the section "Company Assets," under the subheading "Confidential Information," the Code of Conduct states the following, in relevant part:

Orthofix provides its employees with confidential information relating to Orthofix and its business with the understanding that such information is to be held in confidence and not communicated to anyone who is not authorized to see it, except as may be required by law. The types of information that each employee must safeguard include (but are not limited to) Orthofix's plans and business strategy, merger and acquisition targets and strategy, unannounced products and/or contracts, sales data, significant projects, customer and supplier lists, patents, patent applications, trade secrets, manufacturing techniques, marketing plans and strategies, and non-public financial information, whether in electronic or paper format. These are costly, valuable resources developed for the exclusive benefit of Orthofix. No employee may disclose Orthofix's confidential information to an unauthorized third party or use Orthofix's confidential information for their own personal benefit.

93.     Under the heading "Workplace Conduct," the Code of Conduct states the following:

Orthofix's goal is to offer high-quality products and services while providing a workplace that promotes basic human rights based on shared values of respect, fairness, safety, equality, and interdependence. Employees also have a responsibility for assisting in this goal by exhibiting integrity in words and actions and by following employment laws as well as Orthofix's policies designed to safeguard and promote these values as set forth in applicable employee handbooks

- 32 -

or otherwise communicated by Human Resources, the Compliance Department or the Legal Department. Set forth below are some of the important principals and policies that Orthofix is committed to and expects all its employees to be committed to as it relates to respectful employee conduct, safety, and diversity and inclusion. While third party non-employee representatives are not subject to Orthofix's Employee Handbook or Orthofix's employee policies, Orthofix does expect third party representatives contracting with Orthofix to be respectful to Orthofix employees, customers and patients and not engage in conduct in violation of the expectations described below in their interactions with Orthofix employees, customers and patients.

94.     In the same section, under the subheading "Your Responsibilities," the Code of

Conduct states the following:

- Never treat another employee differently because of their race, color, age, sex, religion, sexual orientation, gender identity or expression, disability, ancestry, marital status, national origin, pregnancy or because of any other protected characteristic.

- Ensure your actions and words toward other employees are respectful and not harassing or discriminatory in violation of policy or law.

- Never drink alcohol before or during your working hours or have possession of or use illegal drugs.

- Help to maintain a safe and healthy working environment.

95.     In the heading section "Compliance with Laws," under the subheading "Insider

Trading," the Code of Conduct states the following:

Insider trading means entering into a transaction to buy or sell securities, such as shares of stock, while in possession of material information that is not known to the public. Information is "material" if a reasonable investor would attach importance to the information in deciding whether to buy, sell or hold the securities or if the information could cause a change in its market price. Examples of information that is generally considered "material" include financial results and pending corporate transactions.

The trading of securities while in possession of material, nonpublic information is illegal and, if the trades are made in the Company's stock, it is a violation of Orthofix policy. Material, nonpublic information obtained concerning other companies, including our suppliers and customers, as a result of your employment

with the Company, also may not be used by you under law to trade in such other company's securities. You are also prohibited from communicating (called "tipping") any such information to others who might trade on the basis of that information. If you have regular access to material, nonpublic information concerning the Company or another company, you need to take special care when planning your stock trades.

The laws against insider trading are complex. If you are uncertain about the constraints on your purchase or sale of Orthofix securities or the securities of any other company that you are familiar with by virtue of your relationship with the Company, you should consult with the Company's Legal Department before making such purchase or sale. Note that certain employees are subject to "blackout" periods where they are strictly prohibited from trading. These generally coincide with the announcement of the Company's quarterly financial reporting. Details relating to the requirements that all Orthofix directors, officers, managers, employees, and third parties must adhere to with respect to insider trading are set forth in detail in the Company's Insider Trading Policy.

96.     In the section "Accurate Financial Reporting," under the subheading "Accounting

Controls," the Code of Conduct states the following:

Accounting controls should be sufficient to provide reasonable assurance that:

- Financial contracts are carried out with management's approval.

- No verbal contracts or unauthorized side-letter agreements are entered into.

- All transactions are recorded to help us prepare our financial statements and account for assets.

- Access to assets is permitted only with management's approval.

- Recorded assets are periodically compared with existing assets. Any differences should be reported to management.

- No undisclosed or unrecorded funds or assets have been established.

97.     In the same section, under the subheading "Internal Controls," the Code of Conduct

states the following:

It is Orthofix's policy to maintain books, records and accounts that accurately and fairly reflect all transactions, dispositions of assets and other events that are subject

- 34 -

to regulatory record keeping requirements, including generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements and for preparing periodic reports filed with the SEC. Under no circumstance may there be any unrecorded liability or fund of Orthofix, regardless of the purposes for which the liability or fund may have been intended, or any improper or inaccurate entry knowingly made on the books or records of Orthofix.

98.     In the same section, under the subheading "Retention of Financial Records," the Code of Conduct states the following:

It is Orthofix's policy to maintain financial records in an accurate and complete manner. These records serve as the basis for managing the business and measuring and fulfilling our obligations to patients, employees, suppliers and shareholders. These records are also used for compliance with tax, regulatory and financial reporting requirements. No applicable documents will be destroyed during an investigation initiated by authorities

### *Corporate Governance Guidelines*

99.     The Company's Corporate Governance Guidelines were adopted to "reflect the Company's commitment to good corporate governance and to comply with applicable Nasdaq Stock Market Listing Rules (the "Nasdaq Listing Rules") and legal requirements."

100.     The Corporate Governance Guidelines state the "Basic Responsibilities" of the directors as:

The business affairs of the Company are managed subject to the oversight of the Board, which represents and is accountable to the stockholders of the Company. The Board's responsibilities are active and not passive and include the responsibility to oversee the strategic direction of the Company, the Company's financial objectives and major corporate plans, risk oversight, management policies, and the effectiveness with which management implements its policies. The Board may delegate areas of its responsibility to the appropriate standing or ad hoc committees of the Board. For those instances for which action is operationally desired between Board meetings, the Board may delegate powers to committees of the Board, as appropriate. Such delegation, if made, will generally apply to a named specific action or to one or more specified categories of such matters.

101.    In violation of the Code of Conduct and the Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Securities Act and Exchange Act. Also, in violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct and Corporate Governance Guidelines, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## ORTHOFIX'S AUDIT & FINANCE COMMITTEE CHARTER

102.    The Company also maintains an Audit & Finance Committee Charter (the "Audit & Finance Committee Charter"). According to the Audit & Finance Committee Charter, the purpose of the Audit & Finance Committee is to:

> The Committee shall act on behalf of, and provide assistance to, the Board in fulfilling its oversight responsibility relating to: the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company; the performance of the Company's internal audit function; the Company's enterprise risk management program; the Company's finance and related matters; and the Company's compliance with applicable Requirements, in each case, as further described herein. In so doing, it is the responsibility of the Committee to maintain unrestricted and open communication among the Committee, the independent registered public accounting firm engaged by the Company for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company ("Auditors"), the Company's internal audit function, and management of the Company. The Committee shall have full power and authority to discharge all of its duties and responsibilities.

103.    The Audit & Finance Committee Charter, under the heading "Duties and Responsibilities," states that the Audit & Finance Committee's responsibilities are, *inter alia*:

a.    The primary responsibility of the Committee is to oversee the Company's accounting and financial reporting processes and the audit of the Company's financial statements on behalf of the Board.  For purposes of clarification, management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The Auditors are responsible for auditing the Company's financial statements and for reviewing the Company's unaudited interim financial statements.

b.    The Committee shall develop and implement procedures, as it deems appropriate, to enable it to accomplish the tasks outlined in this charter. The procedures may be modified from time to time by the Committee to address any issues, concerns, or Requirements at the Committee's discretion.

c.    The Committee shall be directly responsible for the appointment, compensation, retention, termination, evaluation and oversight of the work of the Auditors (including resolution of disagreements between management and the Auditors regarding financial reporting). The Auditors report directly to the Committee and the Committee shall discuss with the Auditors the overall scope and plans for the audit of the Company's financial statements. The Committee shall pre-approve all audit, review, attest and permissible non-audit services provided by the Auditors (subject to the exceptions in respect of non-audit services that are described in Rule 2-01(c)(7)(i) of Regulation S-X) and shall not engage the Auditors to perform specific non-audit services proscribed by any Requirement. At least annually, the Committee shall receive and review a written report from the Auditors (i) describing the Auditors' internal quality control procedures, (ii) detailing (A) any material issues raised by the most recent internal quality-control review, peer review, or Public Company Accounting Oversight Board ("PCAOB") review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the firm, and (B) any steps taken to deal with any such issues, and (iii) delineating all relationships between the Auditors and the Company, including the partner rotation requirements established by the SEC; and the Committee shall consider and discuss with the Auditors any disclosed issues, relationships or services that may impact the Auditors' objectivity and independence, and assess and otherwise take, or recommend that the Board take, appropriate action to oversee the independence of the Auditors.

d.      The Committee shall review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the Auditors' report on the effectiveness of internal control over financial reporting.  The Committee shall discuss with management, the CAE (as defined below) and the Auditors the adequacy and effectiveness of the Company's internal control over financial reporting, including any material weaknesses or significant deficiencies identified and any special audit steps adopted in light of any material weaknesses or significant deficiencies.

e.      The Committee shall discuss with management its evaluation of the effectiveness of the Company's disclosure controls and procedures.

* * *

g.      The Committee shall meet to review and discuss the annual financial statements, including Management's Discussion and Analysis of Financial Condition and Results of Operations, with management and the Auditors prior to the filing of the Company's Annual Report on Form 10-K ("Form 10-K"). The Committee shall recommend to the Board whether the Form 10-K should include the audited annual financial statements.

h.      The Committee shall review and discuss with the Auditors the report from the Auditors required by Section 10A(k) of the Securities Exchange Act of 1934, as amended, including (i) all critical accounting policies and practices to be used by the Company; (ii) all alternative financial treatments of financial information permissible within generally accepted accounting principles ("GAAP") that have been discussed with management, the ramifications of such alternative treatment, and the independent auditor's preferred treatment; and (iii) other material written communications between the Auditors and management, such as management letters or schedules of unadjusted differences.

* * *

j.      The Committee shall meet to review and discuss the quarterly financial statements, including Management's Discussion and Analysis of Financial Condition and Results of Operations, with management and the Auditors prior to the filing of the Company's Quarterly Report on Form 10-Q. Also, the Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

k.      The Committee may review and discuss with management and the Auditors, as appropriate, earnings press releases (including the use of any pro forma or

adjusted non-GAAP information), as well as the substance of financial information and guidance provided to analysts and ratings agencies.

l.     The Committee shall discuss with the Company's Chief Legal Officer or outside counsel any legal or regulatory matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

m.     The Committee shall oversee and periodically review, in coordination with management, the Company's enterprise risk management program.

\* \* \*

o.     The Committee shall establish and discuss with management the procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, including the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters; provided, however, that oversight of investigations into complaints shall be the responsibility of the Compliance and Ethics Committee.

p.     The Committee shall periodically review and discuss with management the Company's policies and procedures for reviewing and approving or ratifying transactions between the Company and any related person (as defined in Item 404 of Regulation S-K). The Committee shall review and approve or ratify all such related person transactions, in accordance with the Company's applicable policies and procedures. The Committee will report its actions with respect to any related party transactions to the Board.

104.     In violation of the Audit & Finance Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act and the Exchange Act. Moreover, in violation of the Audit & Finance Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports,

comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit & Finance Committee Charter.

## ORTHOFIX'S COMPLIANCE & ETHICS COMMITTEE CHARTER

105.    The Company also maintains a Compliance & Ethics Committee Charter (the "Compliance & Ethics Committee Charter"). According to the Compliance & Ethics Committee Charter, the purpose of the Compliance & Ethics Committee is to:

The Committee shall act on behalf of, and provide assistance to, the Board in overseeing, monitoring, and evaluating:

    a.  the activities and the effectiveness of the Company's Global Compliance and Ethics Program;

    b.  the activities and the effectiveness of the Company's Global Quality and Regulatory Program;

    c.  the Company's compliance with applicable laws, rules, and regulations related to requirements of U.S. federal healthcare programs, requirements of the U.S. Food and Drug Administration ("FDA"), requirements of the European Commission of EU, requirements of the U.S. Anti-Kickback Statute, False Claims Act, Physician Self-Referral Law (Stark Law) and Foreign Corrupt Practices Act, and comparable off-label promotion prohibition, antikickback, anti-bribery and anti-corruption laws of jurisdictions in which the Company does business (collectively, "Compliance Laws");

    d.  the Company's compliance with the terms of settlement agreements that the Company or a subsidiary enters into with governmental authorities, as applicable;

    e.  compliance with the Company's Code of Conduct, industry codes of conduct, policies, and procedures related to Compliance Laws (collectively, "Compliance Policies"); and

    f.  trends and best practices that could affect the Company's business, Global Compliance and Ethics Program, and Global Quality and Regulatory Program.

106.    The Compliance & Ethics Committee Charter, under the heading "Duties and

Responsibilities," states that the Compliance & Ethics Committee's responsibilities are:

a.  In general, the Committee shall endeavor to promote the Company's operations to be in accordance with Compliance Laws, with an appropriate overall corporate "tone" for compliance and ethical business practices.

b.  In particular, the Committee shall—

1.  Oversee, monitor, and evaluate continuing development and implementation of a Global Compliance and Ethics Program, including Compliance Policies designed to prevent and detect violations of Compliance Laws.

2.  Oversee, monitor, and evaluate continuing development and implementation of a Global Quality and Regulatory Program, including compliance with FDA Quality Guidelines, European Medical Device Regulations, and quality and regulatory policies and procedures designed to ensure compliance with laws and regulations applicable to the Company products globally, and report to the Board as to the effectiveness of the Company's Global Quality and Regulatory Program.

3.  Appoint and oversee the activities of the CECO, who shall report to the Company's Chief Executive Officer, but also shall have "dotted line" responsibility to the chairperson of the Committee, who will have direct access to the CECO. The CECO shall have the responsibility for continually developing and implementing the Company's Global Compliance and Ethics Program and the Committee shall report to the Board as to the effectiveness of the Company's Global Compliance and Ethics Program.

4.  Review the activities of the Company's Senior Vice President, Global Regulatory, Quality and Clinical Affairs, who, among other things, has responsibility for continually developing and implementing the Company's Global Quality and Regulatory Program.

5.  Oversee, monitor, and evaluate the Company's implementation as part of its Global Compliance and Ethics Program of:

i.  effective training and education in compliance;

  ii. effective lines of communication regarding compliance matters;

  iii. appropriately designed internal monitoring and auditing;

  iv. regular enforcement of compliance standards; and

  v. prompt responses to detected noncompliance, and undertaking of appropriate corrective action.

6. Oversee, monitor, and evaluate the Company's compliance with and implementation of the terms of any settlement agreements entered into with governmental authorities or warning letters and other directives issued by government agencies to correct or prevent regulatory violations.

7. Recommend such actions or measures to be adopted by the Board that the Committee deems appropriate to improve the effectiveness of the Company's Global Compliance and Ethics Program and the Company's Global Quality and Regulatory Program.

c. In the performance of its duties, the Committee is expected to perform the following specific activities:

1. Perform, or have performed, an evaluation of the performance of the CECO and the Company's compliance function and personnel.

2. Review and approve an annual Global Compliance and Ethics Program plan developed by the CECO.

3. Review an annual Compliance and Ethics Program report provided to the Committee by the CECO, summarizing compliance-related activities undertaken by the Company and the results of all compliance audits.

4. Meet with, and receive reports from, the CECO regarding the CECO's performance and activities, the performance and activities of the Company's compliance function and personnel, and the operations of the Company's Global Compliance and Ethics Program generally.

5. Review new and ongoing investigations into compliance hotline reports and compliance investigations maintained in the Company's third-party case management system.

6. Review and consider, as relevant, legal, compliance, and/or industry changes that may affect the Company's business, Global

Compliance and Ethics Program and Global Quality and Regulatory
Program.

    d.  The Committee has the authority to perform such other duties and
responsibilities as may be assigned to the Committee by the Board.

    e.  It is the intention of the Board and the Committee that all communications
with the CECO and Chief Legal Officer, and any inside or outside legal
counsel (including without limitation those described above) shall be
deemed to constitute communications for the purpose of obtaining legal
advice and are therefore privileged attorney-client communications.

107.    In violation of the Compliance & Ethics Committee Charter, the Individual
Defendants (as key officers and members of the Company's Board) conducted little, if any,
oversight of the Company's engagement in the Individual Defendants' schemes to cause the
Company to issue materially false and misleading statements to the public and to facilitate and
disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust
enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of
the Securities Act and the Exchange Act. Moreover, in violation of the Compensation & Ethics
Committee Charter, the Individual Defendants failed to maintain the Company's high standard for
ethics and compliance with all applicable laws and regulations, act in good faith and diligence
without misstating, misrepresenting, or omitting material facts, and properly report violations of
the Compliance & Ethics Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

108.    Orthofix is an international spine and orthopedics medical technology company.
Orthofix has a diverse portfolio of products that are offered to medical professionals in over 60

countries worldwide, including biologics, spinal hardware, bone growth therapies, and specialized orthopedic solutions.

109.    On October 11, 2022, it was announced that the Company would be merging with SeaSpine, an international medical technology business that focused on surgical solutions for spinal disorders.

110.    In the initial press release, it was announced that SeaSpine's CEO, Defendant Valentine, would take over as President and CEO of the combined company. Eventually, it was further announced that SeaSpine's CFO and COO, Defendant Bostjancic, and SVP and General Counsel, Defendant Keran, would also be taking over as CFO and CLO of the newly combined company, respectively.

111.    On January 4, 2023, the two companies announced the completion of the Merger, set to take effect the following day, January 5, 2023. However, unbeknownst to Orthofix shareholders who voted to approve the Merger via the materially false and misleading Prospectus, the Company's internal controls were not effective, and Defendants Valentine, Bostjancic, and Keran were engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture," including "harassing" and "inappropriate conduct or statements."

**<u>False and Misleading Statements</u>**

***Merger Announcement***

112.    On October 11, 2022, the Company and SeaSpine issued a joint press release on a Form 8-K filed with the SEC announcing the Merger. The press release announced that Defendant

Valentine would serve as President, CEO, and as a member of the Company's Board after the Merger.

113.   That same day, the two companies held a conference call with analysts (the "Merger Announcement Call"). On the Merger Announcement Call were Defendants Serbousek, Valentine, and Bostjancic. On the Merger Announcement Call, it was announced that Defendant Serbousek would serve as the Company's Executive Chairman, and "the remainder of the company's leadership team will be named prior to closing and is expected to be inclusive of executives from both Orthofix and SeaSpine."

114.   Later in the Merger Announcement Call, during the question-and-answer portion, a Truist Securities analyst asked a question regarding the integration of the companies and if management was expecting any initial disruptions. In response, Defendant Serbousek stated:

> Yes. Rich, it's Jon. Having been through a couple of those transactions, and I can fully appreciate the dynamics that's going – that went on in those. What I find really different about this is it's a merger of equals. We're bringing two teams together, and we're building a company of the best and balance between the companies. And I think that's a very different dynamic when you're looking at how you put together a product portfolio, how you put together our management team, how do you put together a commercial team. And so I think that's going to give us an advantage.
>
> And in conversations with Keith [Valentine], very similar philosophies between these companies as far as go-to-market philosophies, how we deal with – manage people, how we build businesses. So I think that's the collaboration that you'll see. Often times -- and it's also in the general structure of the management team, assuming an executive chair role, I must still be around and basically be able to help Keith and the team be as successful as possible and -- but not again -- not get in their way. But it comes down to that I see that as a powerful combination of merger of equals versus just an acquisition and then basically -- oftentimes, the previous management team goes away and you're left with assets, but not people and teams.

### The Offering Materials

115.   On November 23, 2022, the Company began mailing sets of information containing

- 45 -

the Registration Statement, Prospectus, and related oral communications (collectively, the "Offering Materials") to stockholders of both Orthofix and SeaSpine.

116.     The Registration Statement, the first draft of which was filed with the SEC on November 8, 2022 and incorporated related documents, including the Prospectus, was used to effectuate the Merger. The Registration Statement represented that Orthofix's Board had approved the Merger due to, *inter alia*, the "complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate responsibility."

117.     An amendment to the Registration Statement was filed with the SEC on November 22, 2022. The SEC declared the Registration Statement effective that same day.

118.     The Prospectus was filed with the SEC on November 23, 2022. Defendants Serbousek, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West solicited the Prospectus, which contained material misstatements and omissions.

119.     The Prospectus called for the Company's shareholders to vote to approve the issuance of Company shares to SeaSpine shareholders in connection with the Merger.

120.     The Prospectus contained similar misrepresentations as the Registration Statement regarding how the combined Company's leadership team "leverages the talent within both organizations." The Prospectus also listed Defendant Bostjancic as the Company's new CFO and Defendant Keran as the Company's new CLO upon the Merger closing. Additionally, the Prospectus repeated the claims from the Registration Statement about both companies having "strong performance-based culture[s] focused on integrity, collaboration, innovation, diversity and corporate responsibility."

- 46 -

121.    Similarly, the Offering Materials contained numerous materially false and misleading statements regarding the Company's internal controls and procedures. The Offering Materials contained a copy of the Merger Agreement between the two companies that represented Orthofix maintains adequate internal controls over financial reporting:

> Orthofix maintains a system of "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) sufficient to provide reasonable assurance (i) that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied, (ii) that transactions are executed only in accordance with the authorization of management and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of Orthofix's properties or assets. Since January 1, 2020, none of Orthofix, Orthofix's independent accountants, the Orthofix Board or its audit committee has received any oral or written notification of any (A) "significant deficiency" in the internal controls over financial reporting of Orthofix, (B) "material weakness" in the internal controls over financial reporting of Orthofix, or (C) fraud, whether or not material, that involves management or other employees of Orthofix or its Subsidiaries who have a significant role in the internal controls over financial reporting of Orthofix. Since January 1, 2020, any material change in internal control over financial reporting required to be disclosed in any Orthofix SEC Document has been so disclosed.

122.    The Offering Materials continued:

> The "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) utilized by Orthofix are reasonably designed to ensure that all information (both financial and non-financial) required to be disclosed by Orthofix in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that all such information required to be disclosed is accumulated and communicated to the management of Orthofix, as appropriate, to allow timely decisions regarding required disclosure and to enable the chief executive officer and chief financial officer of Orthofix to make the certifications required under the Exchange Act with respect to such reports.

123.    Additionally, in recognizing the importance of internal controls, the Offering Materials recognized that the Company "could" be "harm[ed]" if the Company had weaknesses in internal controls:

> ***If we fail to maintain an effective system of internal controls or discover material weaknesses in our internal control over financial reporting, we may not be able to report our financial results accurately or detect fraud, which could harm our business and the trading price of our common stock.***
>
> Effective internal controls are necessary for us to produce reliable financial reports and are important in our effort to prevent financial fraud. We are required to periodically evaluate the effectiveness of the design and operation of our internal controls. As has occurred in several years prior, these evaluations may result in the conclusion that enhancements, modifications, or changes to our internal controls are necessary or desirable. While management evaluates the effectiveness of our internal controls on a regular basis, these controls may not always be effective. There are inherent limitations on the effectiveness of internal controls, including collusion, management override, and failure of human judgment. Because of this, control procedures are designed to reduce rather than eliminate business risks. If we fail to maintain an effective system of internal controls or if management or our independent registered public accounting firm were to discover material weaknesses in our internal controls, we may be unable to produce reliable financial reports or prevent fraud, which could harm our financial condition and operating results, and could result in a loss of investor confidence and a decline in our stock price.

124.    The Offering Materials also included a copy of the annual report filed with the SEC on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was filed with the SEC on February 25, 2022, was signed by Defendants Serbousek, Rice, Burzik, Burris, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West and contained certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Serbousek and Rice attesting to the accuracy of the 2021 10-K.

125.    The 2021 10-K, as cited within the Offering Materials, said of the Company's internal controls:

**Management's Report on Internal Control over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in the Exchange Act Rule 13a-15(f)). The Company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance

of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding the prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Internal control over financial reporting is designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation of reliable financial statements for external purposes in accordance with U.S. GAAP. Because of the inherent limitations in any internal control, no matter how well designed, misstatements may occur and not be prevented or detected. Accordingly, even effective internal control over financial reporting can provide only reasonable assurance with respect to financial statement preparation. Further, the evaluation of the effectiveness of internal control over financial reporting was made as of a specific date, and continued effectiveness in future periods is subject to the risks that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies and procedures may decline.

In connection with the preparation and filing of this Annual Report, the Company's management, including our President and Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021, based on the framework set forth in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Based on its evaluation, the Company's management concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective based on the specified criteria.

126.     Similarly, the Offering Materials included Form 10-Qs filed by the Company with the SEC throughout the 2022 Fiscal Year. Attached to each of the 10-Qs were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Serbousek and Rice attesting to the accuracy of the 10-Qs.

127.     Regarding the Company's internal controls, all the 10-Qs filed during the 2022 Fiscal Year stated:

There was no change in our internal control over financial reporting, known to the President and Chief Executive Officer or the Chief Financial Officer that occurred for the quarterly period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

128.    The Offering Materials also contained false and misleading information regarding the Company's ethical compliance procedures. In particular, the Offering Materials maintained that the Company complied with all employment and labor laws, specifically concerning "human rights, harassment, discrimination" and "safety and health":

Orthofix is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment, reasonable accommodation, unfair competition, affirmative action, pay equity, employment equity, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), WARN and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law. No Misconduct Allegation has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of Orthofix in such person's capacity as such or, to the knowledge of Orthofix, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of Orthofix, threatened, nor is there any reasonable basis for such a Misconduct Allegation. Within the past four (4) years, Orthofix has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against Orthofix or any person who is or was an officer, director, manager, employee or independent contractor of Orthofix.

129.    The Offering Materials were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the highest officers of the Company's executive management were not committed to conducting business in accordance with legal and ethical standards; (2) these same officers, Defendants Valentine, Bostjancic, and Keran, did not believe in nor the Company maintaining a strong performance-based culture that focuses on integrity, collaboration,

innovation, diversity, and corporate responsibility; (3) as such, Defendants Valentine, Bostjancic, and Keran were instead engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements"; (4) the Company was aware of these violations and downplayed the impact they had on the Company's internal controls; and (5) Orthofix failed to maintain internal controls.

130.     As a result of Defendants Serbousek, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West causing the Offering Materials to be false and misleading, Company shareholders voted to approve the Merger by approving the issuance of Company shares to SeaSpine shareholders.

131.     As a result of the shareholders voting to approve the issuance of Company shares to SeaSpine shareholders in connection with the Merger, the Merger was ultimately approved on January 4, 2023.

### *January 4, 2023 Merger Press Release*

132.     On January 4, 2023, Orthofix and SeaSpine issued a joint press release announcing the successful completion of the Merger, to become effective on January 5, 2023 at 12:01 am (the "Merger Press Release"). The Merger Press Release was an attachment to a Form 8-K filed with the SEC on January 5, 2023. The Merger Press Release represented that "the combined Orthofix is a leading global spine and orthopedics company with a complimentary portfolio of biologics, innovative spinal hardware solutions, market-leading bone growth therapies, specialized orthopedic solutions and a leading surgical navigation system."

133.     The Merger Press Release also quoted Defendant Valentine, who stated he was "privileged to lead this talented team and excited for all of the opportunities that lie ahead," before

adding, "together, we are stronger and better positioned to deliver innovative, quality driven solutions for surgeons in their work to improve patients' lives."

### *March 6, 2023 Form 10-K*

134.    On March 6, 2023, the Company filed its annual report on Form 10-K for the 2022 Fiscal Year ("2022 10-K") with the SEC. Attached to the 2022 10-K were SOX certifications signed by Defendants Valentine and Bostjancic attesting to the accuracy of the 2022 10-K. Defendants Valentine, Bostjancic, Burzik, Serbousek, Hannon, Henneman, Hinrichs, Maniar, and Paolucci signed the 2022 10-K.

135.    The 2022 10-K played down the major problems with Orthofix's internal controls, stating the following, in relevant part:

> It is our fundamental policy to conduct business in accordance with the highest ethical and legal standards. We have a comprehensive compliance and ethics program, which is overseen by a Chief Ethics and Compliance Officer, who reports directly to our Chief Executive Officer and the Compliance Committee of the Board of Directors. The program is intended to promote lawful and ethical business practices throughout our domestic and international businesses. It is designed to prevent and detect violations of applicable federal, state, and local laws in accordance with the standards set forth in guidance issued by the U.S. Department of Justice ("U.S. DOJ") ("Evaluation of Corporate Compliance Programs" (updated June 2020)), the Office of Inspector General (HCCA-OIG "Measuring Compliance Program Effectiveness: A Resource Guide" (March 2017)), and the U.S. Sentencing Commission ("Effective Compliance and Ethics Programs" (November 2014)). Key elements of the program include:
>
> - Organizational oversight by senior-level personnel responsible for the compliance function with the Company
>
> - Written standard and procedures, including a Corporate Code of Conduct
>
> - Methods for communicating compliance concerns, including anonymous reporting mechanisms
>
> - Investigation and remediation measures to ensure a prompt response to reported matters and timely corrective action

- Compliance education and training for employees and contracted business associates

- Auditing and monitoring controls to promote compliance with applicable laws and to assess program effectiveness

- Disciplinary guidelines to enforce compliance and address violations

- Due diligence reviews of high risk intermediaries and exclusion lists screening of employees and contracted business associates

- Risk assessments to identify areas of compliance risk.

136.    The statements cited above in ¶¶ 112-114 and 132-135 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the highest officers of the Company's executive management were not committed to conducting business in accordance with legal and ethical standards; (2) these same officers, Defendants Valentine, Bostjancic, and Keran, did not believe in nor the Company maintaining a strong performance-based culture that focuses on integrity, collaboration, innovation, diversity, and corporate responsibility; (3) as such, Defendants Valentine, Bostjancic, and Keran were instead engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements"; (4) the Company was aware of these violations and downplayed the impact they had on the Company's internal controls; and (5) Orthofix failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 27, 2023 Proxy Statement*

137.    On April 27, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Burzik, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine, as well as non-party Stuart M. Essig ("Essig") solicited the 2023 Proxy Statement, pursuant to Section 14(a)

of the Exchange Act, which contained material misstatements and omissions.

138.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Burzik, Burris, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine, as well as Essig to the Board; (2) approve executive compensation, on an advisory basis; (3) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (4) amend the Certificate of Incorporation to provide exculpation of officers as permitted by recent amendments to Delaware Law; and (5) amend the 2012 Long Term Incentive Plan ("2012 LTIP") to increase the number of available shares by 2,900,000.

139.    The 2023 Proxy Statement noted the purpose of the 2012 LTIP was to "provide eligible employees and non-employee directors an incentive to contribute to the success of the Company and to operate and manage our business in a manner that will provide for our long term growth and profitability and provide a means of attracting, motivating, rewarding and retaining key employees and non-employee directors." According to the 2023 Proxy Statement, as of December 31, 2022, there were 2,024,621 shares available for future grant under the 2012 LTIP. The proposed amendment to the 2012 LTIP would make an additional 2,900,000 shares available. The 2023 Proxy Statement notes the purpose of the amendment to the 2012 LTIP was because Orthofix would not have enough shares available under the  2012 LTIP to pay its "key employees and non-employee directors," including the Individual Defendants: "a result of the consummation of the merger with SeaSpine on January 5, 2023, our number of employees increased from 1,092 to 1,734. Based on projected share needs to execute the Company's long-term incentive program moving forward, if approved, the share increase contemplated by the LTIP Amendment is

anticipated to provide enough shares for the next year."

140.     Additionally, the 2023 Proxy Statement asks shareholders to vote on an amendment to the Certificate of Incorporation that would provide broad exculpation to the officers and directors of the Company (the "Exculpation Amendment"). Specifically, the Exculpation Amendment "would protect certain officers of the Company against personal liability to our stockholders for monetary damages for breach of the duty of care in certain actions as permitted by Section 102(b)(7) of the DGCL."

141.     Regarding "The Board's Role in Risk Oversight," the 2023 Proxy Statement stated the following, in relevant part:

> The Board plays an important role in overseeing various risks that we may face from time to time. While the full Board has primary responsibility for risk oversight, it utilizes its committees, as appropriate, to monitor and address the risks that may be within the scope of a particular committee's expertise or charter. For example, the Audit and Finance Committee oversees our financial statements and receives reports on the Company's enterprise risk management program, the Compliance and Ethics Committee assists in the Board's oversight of compliance with certain legal and regulatory requirements, the Compensation and Talent Development Committee oversees the Company's compensation plans and assures that such plans properly discourage unnecessary and inappropriate risk taking by management, and the Nominating, Governance and Sustainability Committee oversees the identification of potential Board or executive candidates and the Company's ESG programs, inclusive of climate-related matters. The Board believes the composition of its committees, and the distribution of the particular expertise of each committee's members, makes this an appropriate structure to more effectively monitor these risks.
>
> An important feature of the Board's risk oversight function is to receive updates from its committees and management, as appropriate. In that regard, the Board regularly receives updates from the President and Chief Executive Officer, Chief Financial Officer, Chief Legal Officer, and Chief Ethics and Compliance Officer, including in connection with material litigation and legal compliance matters. The Board also receives updates at quarterly in-person or virtual Board meetings on committee activities from each committee Chair. In addition, the senior executive of each Company division or business unit periodically reviews and assesses the most significant risks associated with his or her division or unit. These assessments

are then aggregated by our management team and presented to the Board. The Board regularly discusses with management these risk assessments and includes risk management and risk mitigation as part of its oversight of the enterprise risk management program and its ongoing strategic planning process.

142.    Regarding the Code of Conduct, the 2023 Proxy Statement stated the following, in

relevant part:

We maintain codes of conduct (our "Codes of Conduct") for each of our legacy Orthofix and SeaSpine businesses that are applicable to all employees worldwide of the respective business. The Code of Conduct for the legacy Orthofix business, to which all of our directors and executive officers are subject, is available for review under the "Investors > Governance > Governance Documents" section of our website at www.orthofix.com.

The goals of our Codes of Conduct, as well as our general corporate compliance and ethics program (which we have branded the Integrity Advantage™ Program), are to deter wrongdoing and to promote (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications made by us, (iii) compliance with applicable governmental laws, rules, and regulations, (iv) the prompt internal reporting of violations of our Codes of Conduct to appropriate persons identified therein, and (v) accountability for adherence to our Codes of Conduct. Our Codes of Conduct apply to all areas of professional conduct, including customer relationships, conflicts of interest, financial reporting, use of company assets, insider trading, intellectual property, confidential information, and workplace conduct. Under our Codes of Conduct, employees, directors, and executive officers are responsible for promptly reporting potential violations of any law, regulation, or our Codes of Conduct to appropriate personnel or via a hotline we have established.

We intend to disclose any substantive amendment to, or a waiver from, a provision of the Code of Conduct for the legacy Orthofix business that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in paragraph (b) of Item 406 of Regulation S-K by posting such information on our website at the address specified above.

143.    Defendants Burzik, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine

caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that:

(1) the highest officers of the Company's executive management were not committed to conducting business in accordance with legal and ethical standards; (2) these same officers, Defendants Valentine, Bostjancic, and Keran, did not believe in nor the Company maintaining a strong performance-based culture that focuses on integrity, collaboration, innovation, diversity, and corporate responsibility; (3) as such, Defendants Valentine, Bostjancic, and Keran were instead engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements"; (4) the Company was aware of these violations and downplayed the impact they had on the Company's internal controls; and (5) Orthofix failed to maintain internal controls.

144.    The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

145.    As a result of Defendants Burzik, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted to, *inter alia*: (1) re-elect Defendants Burzik, Burris, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine, as well as Essig to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) approve executive compensation, on an advisory basis; (3) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (4) approve the Exculpation

Amendment to the Certificate of Incorporation; and (5) approve the amendment the 2012 LTIP.

146.    As a result of the shareholders approving the amendment to the 2012 LTIP, there was an additional 2,900,000 shares available for issuance under the 2012 LTIP. The Individual Defendants, many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the amendment to the 2012 LTIP. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2012 LTIP in the future.

147.    As a result of the shareholders approving the Exculpation Amendment to the Certificate of Incorporation, many of the Individual Defendants, specifically Defendants Valentine, Bostjancic, and Keran, aided and abetted by the Board, secured vital exculpation from liability.

**The Truth Begins to Emerge as False and Misleading Statements Continue**

*September 12, 2023 Press Release*

148.    On September 12, 2023, the Company announced, effective immediately, the termination "for cause" of Defendants Valentine, Bostjancic, and Keran following a "unanimous decision by the Board's independent directors." The Press Release revealed that Defendants Valentine, Bostjancic, and Keran "engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture," through making, at least, "harassing" and "inappropriate conduct" and "statements."

The Company announced the appointment of Defendant Burzik as interim CEO, as well as an interim CFO and interim CLO, stating, in relevant part:

> Orthofix Medical Inc. (NASDAQ: OFIX), a leading global spine and orthopedics company, today announced that Catherine Burzik, Chair of the Orthofix Board of Directors, has been appointed Interim Chief Executive Officer; Geoffrey Gillespie, Orthofix Vice President, Corporate Controller, has been appointed Interim Chief Financial Officer; and Puja Leekha, Orthofix Senior Vice President, Chief Ethics and Compliance Officer, has been appointed Interim Chief Legal Officer. ***The appointments are effective immediately and follow the unanimous decision by the Board's independent directors to terminate for cause Keith Valentine, John Bostjancic and Patrick Keran from those respective roles. The Board also requested that Mr. Valentine resign from the Board***. The Board will immediately begin a search for permanent successors.
>
> ***The Board's decision follows an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors. As a result of the investigation, the Board determined that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture***. These matters are unrelated to and do not impact the Company's strategy, results of operations or previously filed financial statements.
>
> Catherine Burzik, Chair of the Orthofix Board, said, "***Orthofix's core values are built around fostering, cultivating and preserving a culture that is respectful, and we do not condone harassing or inappropriate conduct or statements of any kind. We require all employees - and especially our leaders - to behave in accordance with the Company's values. The Board did not make these decisions lightly. We believe they are necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders***."

(Emphasis added).

149.    On this news, Orthofix's stock fell $5.62 per share, or 30.2%, from closing at $18.63 per share on September 11, 2023 to close at $13.01 per share on September 12, 2023 on usually heavy trading volume. However, the Individual Defendants continued to obfuscate the truth about the effectiveness of the Company's internal control procedures for several more months.

***November 8, 2023 Form 10-Q***

150.    On November 8, 2023, the Company filed its quarterly report for the third quarter of the 2023 Fiscal Year with the SEC on Form 10-Q (the "3Q 2023 10-Q"). The 3Q 2023 10-Q was signed by Defendant Burzik in her role as interim CEO of the Company and non-party Geoffrey Gillespie ("Gillespie") in his role as interim CFO of the Company. Attached to the 3Q 2023 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendant Burzik and Gillespie attesting to the accuracy of the 3Q 2023 10-Q.

151.    Regarding the Company's internal controls, the 3Q 2023 10-Q states:

There was no change in our internal control over financial reporting that occurred during the quarterly period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

152.    The 3Q 2023 10-Q was materially false and misleading because it failed to disclose, *inter alia*, that: (1) the Company was aware of the impact the departure of Defendants Valentine, Bostjancic, and Keran had on the Company's internal controls; and (2) Orthofix failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Fully Emerges

***2023 10-K***

153.    The truth fully emerged when, on March 5, 2024, the Company filed the 2023 10-K with the SEC. The 2023 10-K admitted, regarding the Company's internal controls:

In connection with the preparation and filing of this Annual Report, the Company's management, including our President and Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2023, based on the framework

set forth in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Based on its evaluation, the Company's management *concluded that our internal control over financial reporting was not effective* as of December 31, 2023, *due to a material weakness in the design and operation of certain management review controls pertaining to business combinations* and assessing recoverability of goodwill, resulting from *insufficient evidence supporting the precision over the determination of certain estimates and insufficient evidence supporting the operating effectiveness of the associated review controls*. . . .

As permitted by the SEC Staff interpretive guidance for recently acquired businesses, management's assessment and conclusion on the effectiveness of the Company's disclosure controls and procedures as of December 31, 2023, *excludes an assessment of the internal control over financial reporting of the SeaSpine business* acquired on January 5, 2023. SeaSpine represents approximately 52% of consolidated total assets and approximately 35% of consolidated revenues as of and for the year ended December 31, 2023.

(Emphasis added).

154.    The 2023 10-K also revealed that the Company's independent auditor, Ernst & Young LLP, issued its audit report for the 2023 Fiscal Year. This audit report further revealed that Ernst & Young LLP had determined that Company's internal controls were ineffective as well:

We have audited Orthofix Medical Inc.'s internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, because of the effect of the material weakness described below on the achievement of the objectives of the control criteria, *Orthofix Medical Inc. (the Company) has not maintained effective internal control over financial reporting as of December 31, 2023, based on the COSO criteria.*

155.    On this news, Orthofix's stock fell $0.07 per share, or 0.5%, from closing at $13.07 per share on March 4, 2024 to close at $13.00 per share on March 5, 2024.

## DAMAGES TO ORTHOFIX

156.    As a direct and proximate result of the Individual Defendants' conduct, Orthofix has lost and expended, and will continue to lose and expend, many millions of dollars.

157. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

158. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations. These expenditures include, but are not limited to, the costs associated with the Company's hiring of outside legal counsel to perform an investigation into Defendant Valentine's, Bostjancic's, and Keran's misconduct and any subsequent litigation costs associated with the termination of Defendant Valentine, Bostjancic, and Keran.

159. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

160. As a direct and proximate result of the Individual Defendants' conduct, Orthofix has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

161. Plaintiffs bring this action derivatively and for the benefit of Orthofix to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Orthofix, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act and Securities Act,

as well as the aiding and abetting thereof.

162.    Orthofix is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

163.    Plaintiffs are, and have been at all relevant times, shareholders of Orthofix. Plaintiffs will adequately and fairly represent the interests of Orthofix in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

### DEMAND FUTILITY ALLEGATIONS

164.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

165.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following nine individuals: Defendants Burris, Hannon, Henneman, Maniar, and Paolucci (the "Director-Defendants") as well as non-parties Alan Bazaar, Massimo Calafiore, Michael Finegan, and Charles Kummeth (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of these nine Directors.

166.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

167.    Three of the Director-Defendants, Defendants Burris, Hannon, and Paolucci, solicited the materially false and misleading Prospectus, which called for shareholders to approve the Merger by voting to approve the issuance of Company shares to SeaSpine shareholders, thereby enabling the Merger to take place.

168.    Four of the Director-Defendants, Defendants Hannon, Henneman, Maniar, and Paolucci, solicited the 2023 Proxy Statement to call for a vote to, *inter alia*, re-elect themselves, as well as Defendants Burris, Burzik, Hinrichs, and Valentine, plus Essig, to the Board, thus allowing them to continue breaching their fiduciary duties to Orthofix.

169.    In addition, Defendants Hannon, Henneman, Maniar, and Paolucci caused the 2023 Proxy Statement to call for a shareholder vote to approve the amendment to the 2012 LTIP, which increased the amount of shares available under the LTIP by 2,900,000. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the amendment to the 2012 LTIP who would not have approved the amendment to the 2012 LTIP, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the amendment to the 2012 LTIP at the annual meeting of stockholders of Orthofix on June 19, 2023, there were 2,024,621 shares available under the 2012 LTIP, which would have been insufficient to meet the needs of the 2012 LTIP for the next year. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the amendment to the 2012 LTIP that increased the number of shares available under the 2012 LTIP. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

- 64 -

170.     Further, Defendants Hannon, Henneman, Maniar, and Paolucci caused the 2023 Proxy Statement to call for a shareholder vote to approve the Exculpation Amendment to the Certificate of Incorporation, which provided exculpation from liability to officers of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Exculpation Amendment who would not have approved the Exculpation Amendment, had they been informed about the Individual Defendants' misconduct.

171.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

172.     Additional reasons that demand on Defendant Burris is futile follow. Defendant Burris has served as a Company director since June 2023, and previously from September 2021 until the Merger in January 2023. He also serves as the Chair of the Audit & Finance Committee and as a member of the Nominating, Governance & Sustainability Committee. Defendant Burris has received and continues to receive lucrative compensation for his role as a director as described above. Furthermore, he solicited the Prospectus, which contained materially false and misleading statements and led to the approval of the issuance of Company shares to SeaSpine shareholders in connection with the Merger, thereby enabling the Merger to take place. As one of the Company's trusted directors, Defendant Burris was ultimately responsible for all of the false and misleading

statements and omissions that were made by or on behalf of the Company during the Relevant Period. As a trusted Company director, Defendant Burris conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Burris is named as a defendant in the California Securities Class Action. Moreover, under the amendment to the 2012 LTIP, Defendant Burris is eligible to receive stock awards under the amendment to the 2012 LTIP, thereby materially benefitting from the adoption of the amendment to the 2012 LTIP. For these reasons, Defendant Burris breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.     Additional reasons that demand on Defendant Hannon is futile follow. Defendant Hannon has served as a Company director since June 2020. He also serves as Chair of the Compliance & Ethics Committee and as a member of the Compensation & Talent Development Committee. Defendant Hannon has received and continues to receive lucrative compensation for his role as a director as described above. Furthermore, he solicited the Prospectus, which contained materially false and misleading statements and led to the approval of the issuance of Company shares to SeaSpine shareholders in connection with the Merger, thereby enabling the Merger to take place. Defendant Hannon also solicited the 2023 Proxy Statement, which led to the reelection of Defendants Burris, Burzik, Henneman, Hinrichs, Maniar, Paolucci, and Valentine, as well as non-Party Essig and himself, to the Board, allowing them to continue breaching their fiduciary duties to the Company, caused shareholders to approve the amendment to the 2012 LTIP, and

caused shareholders to approve the Exculpation Amendment. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Hannon is named as a defendant in the California Securities Class Action. Moreover, under the amendment to the 2012 LTIP, Defendant Hannon is eligible to receive stock awards under the amendment to the 2012 LTIP, thereby materially benefitting from the adoption of the amendment to the 2012 LTIP. For these reasons, Defendant Hannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Henneman is futile follow. Defendant Henneman has served as a Company director since the Merger in January 2023. Previously, Defendant Henneman served as a director for SeaSpine from July 2015 until the Merger in January 2023. He also serves as the Chair of the Nominating, Governance & Sustainability Committee and as a member of the Audit & Finance Committee. Defendant Henneman has received and continues to receive lucrative compensation for his role as a director as described above. Defendant Henneman also solicited the 2023 Proxy Statement, which led to the reelection of Defendants Burris, Burzik, Hannon, Hinrichs, Maniar, Paolucci, and Valentine, as well as non-Party Essig and himself, to the Board, allowing them to continue breaching their fiduciary duties to the Company, caused shareholders to approve the amendment to the 2012 LTIP, and caused shareholders to approve the Exculpation Amendment. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and

misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, under the amendment to the 2012 LTIP, Defendant Henneman is eligible to receive stock awards under the amendment to the 2012 LTIP, thereby materially benefitting from the adoption of the amendment to the 2012 LTIP. For these reasons, Defendant Henneman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Maniar is futile follow. Defendant Maniar has served as a Company director since the Merger in January 2023. She also serves as a member of the Audit & Finance Committee and the Compliance & Ethics Committee. Defendant Maniar has received and continues to receive lucrative compensation for her role as a director as described above. Defendant Maniar also solicited the 2023 Proxy Statement, which led to the reelection of Defendants Burris, Burzik, Hannon, Henneman, Hinrichs, Paolucci, and Valentine, as well as non-Party Essig and herself, to the Board, allowing them to continue breaching their fiduciary duties to the Company, caused shareholders to approve the amendment to the 2012 LTIP, and caused shareholders to approve the Exculpation Amendment. As a trusted Company director, she conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Maniar made an insider sale while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with person proceeds of approximately $75,650. Moreover, under the amendment to the 2012 LTIP,

Defendant Maniar is eligible to receive stock awards under the amendment to the 2012 LTIP, thereby materially benefitting from the adoption of the amendment to the 2012 LTIP. For these reasons, Defendant Maniar breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176.     Additional reasons that demand on Defendant Paolucci is futile follow. Defendant Paolucci has served as a Company director since March 2016. He also serves as a member of the Nominating, Governance & Sustainability Committee and the Compensation & Talent Committee. Defendant Paolucci has received and continues to receive lucrative compensation for his role as a director as described above. Furthermore, he solicited the Prospectus, which contained false and misleading statements and led to the approval of the issuance of Company shares to SeaSpine shareholders in connection with the Merger, thereby enabling the Merger to take place. Defendant Paolucci also solicited the 2023 Proxy Statement, which led to the reelection of Defendants Burris, Burzik, Hannon, Henneman, Hinrichs, Maniar, and Valentine, as well as non-Party Essig and himself, to the Board, allowing them to continue breaching their fiduciary duties to the Company, caused shareholders to approve the amendment to the 2012 LTIP, and caused shareholders to approve the Exculpation Amendment. As a trusted Company director, he conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Paolucci is named as a defendant in the California Securities Class Action. Moreover, under the amendment to the 2012 LTIP, Defendant Paolucci is eligible to receive stock awards under the amendment to the 2012 LTIP, thereby materially benefitting from the adoption of the amendment to the 2012

LTIP.   For these reasons, Defendant Hart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.   Additional reasons that demand on the Board is futile follow.

178.   Defendants Burris, Henneman, and Maniar (collectively the "Audit & Finance Committee Defendants") served as members of the Audit & Finance Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit & Finance Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit & Finance Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

179.   Defendants Hannon and Maniar (collectively, the "Compliance & Ethics Committee Defendants") served as members of the Compliance & Ethics Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's compliance policies and procedures, and the Company's compliance with applicable laws and ethical standards. During the Relevant Period, they violated the Compliance & Ethics Committee Charter by engaging in or

permitting the Company to engage in unethical conduct that led to the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including Defendants Valentine, Bostjancic, and Keran's breaches of the Code of Conduct that led to their removal as officers of the Company. Thus, the Compliance & Ethics Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

180.   In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Securities Act and the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct by failing to act with integrity, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

181.   Orthofix has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Orthofix any part of the damages Orthofix suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

182.   The Individual Defendants' conduct described herein and summarized above could

not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

183.   The acts complained of herein constitute violations of fiduciary duties owed by Orthofix's officers and directors, and these acts are incapable of ratification.

184.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Orthofix. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Orthofix, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

185.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Orthofix to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

186.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

187.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

188.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

189.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

190.    Under the direction and watch of Defendants Serbousek, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West, the Prospectus failed to disclose that SeaSpine's executive management, including Defendants Valentine, Bostjancic, and Kernan, who were set to take control of Orthofix, did not hold a "strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate responsibility."

191.    The Prospectus also failed to disclose that: (1) the highest officers of the Company's executive management were not committed to conducting business in accordance with legal and ethical standards; (2) these same officers, Defendants Valentine, Bostjancic, and Keran, did not believe in nor the Company maintaining a strong performance-based culture that focuses on integrity, collaboration, innovation, diversity, and corporate responsibility; (3) as such, Defendants Valentine, Bostjancic, and Keran were instead engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements"; (4) the Company was aware of these violations and downplayed the impact they had on the Company's internal controls; and (5) Orthofix failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

192.    In exercise of reasonable care, Defendants Serbousek, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Prospectus were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on matters set forth for shareholder in the Prospectus, including the approval of the Merger by approving the issuance of Company shares to SeaSpine shareholders.

193.    The false and misleading elements of the Prospectus led to, among other things, the approval of the Merger by approving the issuance of Company shares to SeaSpine shareholders.

194.    The Company was damaged as a result of Defendants Serbousek's, Burris's, Burzik's, Hannon's, Hinrichs's, Marks's, Paolucci's, Sicard's, and West's material misrepresentations and omissions in the Prospectus.

195.    Under the direction and watch of Defendants Burzik, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine, the 2023 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

196.    The 2023 Proxy Statement also failed to disclose that: (1) the highest officers of the Company's executive management were not committed to conducting business in accordance with legal and ethical standards; (2) these same officers, Defendants Valentine, Bostjancic, and Keran, did not believe in nor the Company maintaining a strong performance-based culture that focuses on integrity, collaboration, innovation, diversity, and corporate responsibility; (3) as such, Defendants Valentine, Bostjancic, and Keran were instead engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements"; (4) the Company was aware of these violations and downplayed the impact they had on the Company's internal controls; and (5) Orthofix failed to maintain internal controls. As a result of the foregoing, the Company's

public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

197.    In exercise of reasonable care, Defendants Burzik, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to the re-election of Defendants Burzik, Burris, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine to the Board, the approval of the amendment to the 2012 LTIP, and the approval of the Exculpation Amendment.

198.    The false and misleading elements of the 2023 Proxy Statement led to, among other things, the re-election of Defendants Burzik, Burris, Hannon, Henneman, Hinrichs, Maniar, Paolucci, and Valentine to the Board, the approval of the amendment to the 2012 LTIP, and the approval of the Exculpation Amendment.

199.    The Company was damaged as a result of Defendants Burzik's, Hannon's, Henneman's, Hinrichs's, Maniar's, Paolucci's, and Valentine's material misrepresentations and omissions in the 2023 Proxy Statement.

200.    Plaintiffs, on behalf of Orthofix, have no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

201.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

202.    Each Individual Defendant owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of Orthofix's business and affairs.

203.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

204.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Orthofix.

205.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Orthofix's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the highest officers of the Company's executive management were not committed to conducting business in accordance with legal and ethical standards; (2) these same officers, Defendants Valentine, Bostjancic, and Keran, did not believe in nor the Company maintaining a strong performance-based culture that focuses on integrity, collaboration, innovation, diversity, and corporate responsibility; (3) as such, Defendants Valentine, Bostjancic, and Keran were instead engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements"; (4) the Company was aware of these violations and downplayed the impact they had on the Company's internal controls; and (5) Orthofix failed to maintain internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

206.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

207.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

208.    In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendants engaged in lucrative insider sales while the stock prices were artificially inflated before the fraud was exposed, netting proceeds of approximately $75,650.

209.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein, including failing to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Orthofix's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

210.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

211.    As a direct and proximate result of the Individual's Defendants' breaches of their

fiduciary obligations, Orthofix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

212.    Plaintiffs, on behalf of Orthofix, have no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

213.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

214.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Orthofix.

215.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Orthofix that was tied to the performance or artificially inflated valuation of Orthofix, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

216.    Plaintiffs, as shareholders and representatives of Orthofix, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

217.    Plaintiffs, on behalf of Orthofix, have no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

218.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

219.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Orthofix, for which they are legally responsible.

220.   As a direct and proximate result of the Individual Defendants' abuse of control, Orthofix has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Orthofix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

221.   Plaintiffs, on behalf of Orthofix, have no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

222.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

223.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Orthofix in a manner consistent with the operations of a publicly held corporation.

224.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Orthofix has sustained and will continue to sustain significant damages.

- 80 -

225.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

226.    Plaintiffs, on behalf of Orthofix, have no adequate remedy at law.

## SIXTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

227.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

228.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

229.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Orthofix to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

230.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

231.    Plaintiffs, on behalf of Orthofix, have no adequate remedy at law.

## SEVENTH CLAIM
**Against Defendants Serbousek, Valentine, Keran, Elting, Rice, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

232.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

233.    As a result of the conduct and events alleged above, the Company is a defendant in

the California Securities Class Action brought on behalf of Orthofix shareholders, in which it is a joint tortfeasor in claims brought under Sections 11, 12, and 15 of the Securities Act.

234.   Federal law provides Orthofix with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

235.   The plaintiffs in the California Securities Class Action allege that the Registration Statement issued in connection with the Company's Merger contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

236.   Orthofix is the registrant for the Merger. Defendants Serbousek, Valentine, Keran, Elting, Rice, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West were responsible for the contents and dissemination of the Registration Statement.

237.   As issuer of the shares, Orthofix is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

238.   The plaintiffs in the California Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

239.   Defendants Serbousek, Valentine, Keran, Elting, Rice, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West, because of their positions of control and authority as officers and/or directors of Orthofix, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Orthofix, including the wrongful acts complained of herein and in the California Securities Class Action.

240.    Accordingly, Defendants Serbousek, Valentine, Keran, Elting, Rice, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

241.    As such, Orthofix is entitled to receive all appropriate contribution or indemnification from Defendants Serbousek, Valentine, Keran, Elting, Rice, Burris, Burzik, Hannon, Hinrichs, Marks, Paolucci, Sicard, and West.

<u>**EIGHTH CLAIM**</u>
**Against Defendants Serbousek, Valentine, Bostjancic, and Keran for Contribution Under Sections 10(b) and 21D of the Exchange Act**

242.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in above, as though fully set forth herein.

243.    Orthofix and Defendants Serbousek, Valentine, Bostjancic, and Keran are named as defendants in the Texas Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Texas Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Serbousek's, Valentine's, Bostjancic's, and Keran's willful and/or reckless violations of their obligations as officers, directors, and/or former officers of Orthofix.

244.    Defendants Serbousek, Valentine, Bostjancic, and Keran, because of their positions of control and authority as officers, directors, and/or former officers of Orthofix, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Orthofix,

including the wrongful acts complained of herein and in the Texas Securities Class Action.

245.    Accordingly, Defendants Serbousek, Valentine, Bostjancic, and Keran are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

246.    As such, Orthofix is entitled to receive all appropriate contribution or indemnification from Defendants Serbousek, Valentine, Bostjancic, and Keran.

<u>**REQUEST FOR RELIEF**</u>

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Orthofix, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Orthofix;

(c)    Determining and awarding to Orthofix the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Orthofix and the Individual Defendants to take all necessary actions to reform and improve Orthofix's corporate governance and internal procedures to comply with applicable laws and to protect Orthofix and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and

taking the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of Orthofix to nominate at least five candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Orthofix restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 28, 2024

THE BROWN LAW FIRM, P.C.

*/s/ Saadia Hashmi*
Saadia Hashmi (TX Bar No. 24139546)

767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiffs*

## <u>VERIFICATION</u>

I, Felicia Marti, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 21 __ day of October, 2024.

DocuSigned by:

BF3323A39CF3498...

Felicia Marti

## **VERIFICATION**

       I, Guillermo Marti, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

       I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24__ day of October, 2024.

Firmado por:

*Guillermo Marti*

1A9FE288EBC042E

Guillermo Marti